CITIZENS FOR AN ORDERLY ENERGY POLICY, INC., et al., Plaintiffs,

v.

The COUNTY OF SUFFOLK and Peter F. Cohalan, Defendants,

Long Island Lighting Company and the Shoreham-Wading River Central School District, Intervenor-Plaintiffs.

No. CV–83–4966.

United States District Court, E.D. New York.

March 18, 1985.

1086

Pacific Legal Foundation by Lucinda Low Swartz, Washington, D.C., for plaintiff Citizens for an Orderly Energy Policy.

Edward M. Barrett by Rosalind M. Gordon, Mineola, N.Y., Hunton & Williams by W. Taylor Reveley, III, James E. Farnham, K. Dennis Sisk, Richmond, Va., for intervenor-plaintiff Long Island Lighting Co.

Lou Lewis, Poughkeepsie, N.Y., for plaintiff-intervenor Shoreham Wading River Central School Dist.

Martin Bradley Ashare, Suffolk Co. Atty., Hauppauge, N.Y., Kirkpatrick, Lockhart, Johnson & Hutchison by David A. Brownlee, Michael J. Lynch, Kenneth M. Argentieri, Pittsburgh, Pa., Kirkpatrick, Lockhart, Hill, Christopher & Phillips by Herbert H. Brown, Lawrence C. Lanpher, Washington, D.C., for defendants.

## MEMORANDUM AND ORDER

ALTIMARI, District Judge.

The present controversy centers around the County of Suffolk's lack of participation in off-site radiological emergency evacuation planning for the Long Island Lighting Company's ("LILCO") Shoreham Nuclear Power Facility ("Shoreham"), an 809 megawatt nuclear powered electric generating facility located on Long Island's north shore in the County of Suffolk (the "County"). LILCO and its supporters contend that the County's actions may result in the denial of an operating license for Shoreham and spell financial doom and bankruptcy for the company. The County and its supporters, including the Governor of the State of New York, *see Cuomo v. Long Island Lighting Co.*, 589 F.Supp. 1387 (E.D.N.Y.1984), contend that in the event of a nuclear accident at Shoreham, safe and speedy evacuation is a geographical impossibility, and that the County may rightly refuse to participate in any emergency planning.

## FACTS

Plaintiffs, Citizens for an Orderly Energy Policy, Inc., a not-for-profit corporation, and five of its members (hereinafter collec-

tively referred to as "Citizens" or "Plaintiffs") commenced this action on or about November 10, 1983. Thereafter on April 11, 1984, the Court granted LILCO and the Shoreham-Wading River Central School District (the "District") leave to intervene as plaintiffs. *See* 101 F.R.D. 497 (E.D.N.Y. 1984).

Citizens' complaint alleges the following. In early 1975, the County started to assist LILCO in the development of an emergency plan for Shoreham. This spirit of cooperation is said to have lasted until early 1982 when the Suffolk County Legislature adopted the first of three resolutions.

On March 23, 1982, the legislature adopted resolution No. 262–1982. That resolution, in relevant part, directs the Suffolk County Planning Department to prepare "a County Radiological Emergency Response Plan to serve the interest of safety, health and welfare of the residents of Suffolk County...." The resolution further stated that the plan was not to be submitted to the Federal Emergency Management Agency ("FEMA") and the Nuclear Regulatory Commission ("NRC") until approved by the County Legislature.

Resolution No. 456–1982, adopted on May 18, 1982, provides that the County has the primary responsibility for the protection of its residents in the event of a nuclear accident at Shoreham; that the County "intends through good faith and sound planning efforts to assure that the best possible emergency plan and preparedness are developed"; and that LILCO has "gone beyond its powers as a private corporation in an attempt to usurp the rightful powers of Suffolk County." In addition the resolution provided that

Suffolk County shall not assign funds or personnel to test or implement any radiological emergency response plan for the Shoreham Nuclear Plant unless that plan has been fully developed to the best of the County's ability.

Suffolk County shall not assign funds or personnel to test or implement any radiological emergency response plan for the Shoreham Nuclear Plant unless that plan

has been the subject of at least two public hearings, one to be held in Riverhead, and one to be held in Hauppauge. Suffolk County shall not assign funds or personnel to test or implement any radiological emergency response plan for the Shoreham Nuclear Plant unless that plan has been approved, after public hearings, by the Suffolk County Legislature and the County Executive.

The third and central resolution, No. 111–1983, was adopted on February 17, 1983. In sum, the six page resolution states that after extensive study the legislature determined that no emergency plan could adequately protect the health and safety of the County's residents and, therefore, no local plan was to be adopted or implemented. Accordingly, the County's radiological emergency planning process was terminated and the County Executive was "directed to take all actions necessary to assure that actions taken by any other governmental agency, be it state or federal, are consistent with the decisions mandated by this Resolution."

Plaintiffs allege that the County's resolutions "were enacted solely on the basis of a perceived need to protect the public from the dangers of nuclear power." Complaint at par. 21. They assert that the County's resolutions express an intent to refuse to develop or consider any emergency plan and to determine the adequacy of all radiological response plans in an attempt to regulate the operation of Shoreham on the basis of radiological hazards and safety, a field preempted by federal law. In addition, they contend that the County's decision that no emergency plan could adequately protect the public health and safety is in conflict with the NRC's responsibility to determine such issues and frustrates the federal policy of encouraging the development of nuclear power. Accordingly, plaintiffs seek a judgment declaring the above resolutions void and illegal as preempted by the Atomic Energy Act (the "AEA"). 42 U.S.C. § 2011, *et seq.*

For their state law cause of action, plaintiffs contend that the County has a state

constitutional duty to protect the health, safety and welfare of its residents, *see* N.Y. Const. art. 9, § 2(c)(10), and a statutory duty to prepare a local disaster preparedness plan and to provide assistance and relief in the event of a radiological emergency. *See* N.Y.Exec.Law §§ 20, 23, 25 (McKinney 1982). Plaintiffs maintain that the County's refusal to participate in emergency planning and its intended refusal to act should an accident occur are contrary to the County's duty. For their relief, plaintiffs seek an injunction requiring the Suffolk County Planning Department to develop or assist in the development of a radiological emergency response plan for Shoreham and requiring the County to make available all necessary resources in order to protect the health and safety of its residents.

LILCO's intervenor complaint makes two claims for relief. First, it endorses plaintiffs' argument that the County's resolutions and acts "constitute an impermissible attempt by a local government to regulate and prevent the operation of a commercial nuclear power station on grounds ... regarding radiological safety" and are, therefore, preempted by the AEA. LILCO Complaint at par. 57. Second, LILCO alleges that "defendants' about-face regarding emergency planning for Shoreham, predicated as it was on an impermissible usurpation of the NRC's exclusive regulatory authority, constitutes an arbitrary, capricious, and malicious deprivation of LILCO's property without due process of law." *Id.* at par. 58; *see* LILCO complaint par. 56. By way of relief, LILCO seeks a judgment declaring the resolutions in question void and illegal. In addition, unlike Citizens, LILCO seeks an injunction under 42 U.S.C. § 1983 and the due process clause of the United States Constitution "requiring Suffolk County and [Peter] Cohalan to fulfill their duty to exercise their governmental functions fairly by taking all reasonable steps necessary to assist LILCO in emergency planning for Shoreham."

Lastly, the district's intervenor complaint is essentially identical to Citizens but adds that defendants' acts have specifically vio-

lated the AEA and give rise to jurisdiction under the AEA itself.

Defendants move to dismiss the original and intervenor complaints pursuant to Federal Rules of Civil Procedure 12(b)(1) and 12(b)(6). While defendants challenge Citizens' standing to maintain the action and have raised other jurisdictional questions, and while "[i]ntervention cannot cure any jurisdictional defect that would have barred the ... court from hearing the original action," 7A C. Wright & A. Miller, *Federal Practice and Procedure*, § 1917, at 584 (1972), the court has decided to address the three motions to dismiss in one opinion regardless of the determination on Citizens' standing. The court follows this procedure because if Citizens is without standing, LILCO's pleading would be considered as a separate action with an independent basis for jurisdiction over defendants. Failure to adjudicate LILCO's claim would merely require LILCO to file a new suit and bring the parties to the point where they now stand after an unnecessary delay. *See Miller & Miller Auctioneers, Inc. v. G.W. Murphy Industries, Inc.*, 472 F.2d 893, 895–96 (10th Cir.1973); *Hackner v. Guaranty Trust Co.*, 117 F.2d 95 (2d Cir.), *cert. denied*, 313 U.S. 559, 61 S.Ct. 835, 85 L.Ed. 1520 (1941); *Corporacion Venezolan de Fomento v. Vintero Sales Corp.*, 477 F.Supp. 615, 622 (S.D.N.Y.1979). Moreover, while it is sometimes said that an intervenor accepts the pleadings as he finds them and may not add a claim, for much the same practical reason of avoiding unnecessary delay, and because defendants have not objected and have addressed the issue, it is proper for LILCO to prosecute its additional claim under the Civil Rights Act.

### DISCUSSION

### I

Initially, the County challenges this court's jurisdiction over this action. Citizens contends that this action arises under federal law. *See* 28 U.S.C. § 1331. Specif-

ically, Citizens cites the Constitution's supremacy clause, U.S. Const. art. VI, cl. 2, which is the basis of the preemption doctrine, and the Atomic Energy Act. 42 U.S.C. § 2011 *et seq.* The intervenors echo Citizens' contentions. The defendants maintain that Citizens' action does not arise under the supremacy clause because plaintiffs are incorrect in their assertion that the County's actions are preempted by the AEA. The defendants also argue that a cause of action may not arise solely under the supremacy clause, because that clause is not a source of federal rights. Additionally, the defendants contend that Citizens' action may not be said to arise under the AEA because the AEA expressly precludes private actions to enforce its terms and the plaintiffs have alleged no substantive violation of the AEA.

■ An action may be said to arise under an Act of Congress if it presents an issue requiring construction or interpretation of that Act. *Ivy Broadcasting Co. v. American Telephone and Telegraph Co.,* 391 F.2d 486, 493 (2d Cir.1968); *T.B. Harms Co. v. Eliscu,* 339 F.2d 823, 828 (2d Cir.1964), *cert. denied,* 381 U.S. 915, 85 S.Ct. 1534, 14 L.Ed.2d 435 (1965). Note, *The Outer Limits of "Arising Under,"* 54 N.Y.U.L.Rev. 978, 1004 (1979).

■ In the instant case, the critical issue, at least with regard to Citizens' federal cause of action, is whether the AEA preempts the County's resolutions. This issue turns squarely on the construction and interpretation of the AEA. Plaintiff's first claim for relief, along with the identical claims of the intervenors, must necessarily arise under the AEA, notwithstanding that the AEA does not provide for private enforcement of its terms. *See Susquehanna Valley Alliance v. Three Mile Island,* 619 F.2d 231, 238 (3d Cir.1980), (" 'no action' language in 42 U.S.C. § 2271(c) is not couched in jurisdictional terms"), *cert. denied, sub nom, General Public Utilities Corp. v. Susquehanna Valley Alliance,* 449 U.S. 1096, 101 S.Ct. 893, 66 L.Ed.2d 824 (1981).

As this court recently stated in a related case involving most of the parties now before the court:

the fact that plaintiffs could not have originally commenced this action in this Court under the AEA [does not necessarily bar] removal of their actions to the federal court. So long as a federal question appears on the face of plaintiffs' complaint ... removal would be proper.

*Cuomo v. Long Island Lighting Co.,* 589 F.Supp. at 1395. Moreover, as another judge of this court has stated, "[t]he availability of a federal remedy is unnecessary to create 'arising under' jurisdiction as long as plaintiffs' right to relief depends upon the construction or application of federal law." *County of Suffolk v. Long Island Lighting Co.,* 549 F.Supp. 1250, 1257 (E.D. N.Y.1982). In fact, plaintiffs do not allege a violation of the terms of the AEA or seek relief thereunder. Instead they seek relief under the Federal Declaratory Judgment Act, 28 U.S.C. § 2201, by way of a judgment declaring defendants' acts illegal and void as preempted by federal law.

Accordingly, in cases most analogous to the one at bar, courts have exercised jurisdiction and reached the merits of the controversy before them. For example, in *United States v. City of New York,* 463 F.Supp. 604 (S.D.N.Y.1978), plaintiff sought a judgment declaring section 175.-107(c) of the New York City Health Code unconstitutional insofar as it had been preempted by the AEA. The Court concluded that it had jurisdiction over plaintiff's claim since it arose under the AEA. *Id.* at 607. Other cases are not to the contrary. *Northern States Power Co. v. Minnesota,* 447 F.2d 1143 (8th Cir.1971), *aff'd mem.,* 405 U.S. 1035, 92 S.Ct. 1307, 31 L.Ed.2d 576 (1972).

Because plaintiff's first cause of action requires construction and interpretation of the AEA, it arises under that statute. As with a plaintiff who seeks injunctive relief from state regulation, "[a] plaintiff who seeks [declaratory] relief from state regulation, on the ground that such regulation is preempted by a federal statute which, by

virtue of the Supremacy Clause of the Constitution, must prevail, thus presents a federal question which the federal courts have jurisdiction under 28 U.S.C. § 1331 to resolve." *Shaw v. Delta Airlines, Inc.,* 463 U.S. 85, 103 S.Ct. 2890, 2899 n. 14, 77 L.Ed.2d 490 (1983). To suggest otherwise would create a void in federal jurisdiction in this critical area.

▮ In addition, whether or not LILCO's complaint under 42 U.S.C. § 1983 states a cause of action on which LILCO could actually recover, the claim alleged is not so patently without merit, wholly insubstantial, or essentially frivolous as to warrant dismissal for lack of jurisdiction. *See Hagans v. Lavine,* 415 U.S. 528, 536–37, 94 S.Ct. 1372, 1378–79, 39 L.Ed.2d 577 (1974); *State of New York District Attorney Investigators Police Benevolent Association, Inc. v. Richards,* 711 F.2d 8, 10 (2d Cir. 1983); *Kohl Industrial Park Co. v. County of Rockland,* 710 F.2d 895, 899 (2d Cir. 1983).

## II

Defendants next challenge Citizens' and the District's standing to prosecute this action. Significantly, defendants have not challenged LILCO's standing; the determination of standing will, therefore, not bar consideration of the essential questions raised in this litigation.

The requirement of standing "subsumes a blend of constitutional requirements and prudential considerations." *Valley Forge Christian College v. Americans United For Separation of Church and State, Inc.,* 454 U.S. 464, 471, 102 S.Ct. 752, 758, 70 L.Ed.2d 700 (1982) (citing *Warth v. Seldin,* 422 U.S. 490, 498, 95 S.Ct. 2197, 2204, 45 L.Ed.2d 343 (1975)). Article III of the Constitution "requires the party who invokes the court's authority to 'show that he personally has suffered some actual or threatened injury as a result of putatively illegal conduct of the defendant; and that the injury 'fairly can be traced to the challenged action' and 'is likely to be redressed by a favorable decision.'" *Valley Forge,* 454 U.S. at 472, 102 S.Ct. at 758. In addi-

tion, the Supreme Court has established a nonconstitutional standing requirement "that the interest of the plaintiff, regardless of its nature in the absolute, at least be 'arguably within the zone of interests to be protected or regulated' by the statutory framework within which his claim arises." *Simon v. Eastern Kentucky Welfare Rights Organization,* 426 U.S. 26, 39 n. 19, 96 S.Ct. 1917, 1925 n. 19, 48 L.Ed.2d 450 (1976) (quoting *Data Processing Service v. Camp,* 397 U.S. 150, 153, 90 S.Ct. 827, 829, 25 L.Ed.2d 184 (1970)).

> An association, such as Citizens, has standing to bring suit on behalf of its members when: (a) its members would otherwise have standing to sue in their own right; (b) the interests it seeks to protect are germane to the organization's purposes; and (c) neither the claim asserted nor the relief requested requires the participation of individual members in the lawsuit.

*Hunt v. Washington Advertising Commission,* 432 U.S. 333, 343, 97 S.Ct. 2434, 2441, 53 L.Ed.2d 383 (1976). Defendants contend that Citizens fails to satisfy the first criteria of this standard and thus lacks standing.

▮ Citizens alleges that its members suffered an injury by virtue of the harm they will suffer as taxpayers, LILCO ratepayers, LILCO shareholders, and persons residing within the Shoreham area. The mere fact that a person is a taxpayer is an insufficient basis for standing to object to particular government conduct. *Valley Forge,* 454 U.S. at 464, 102 S.Ct. at 752. Similarly, conferring standing on any person who is a LILCO ratepayer would permit judicial actions by millions of persons with only the most "generalized grievance." *Id.* at 470, 478–79, 102 S.Ct. at 757, 761–62. Furthermore, the mere fact that a person is a shareholder does not endow that individual with standing to bring suit whenever the corporation's interests are at issue, even though the value of the shareholder's stock may arguably be affected. *Vincel v. White Motor Corp.,* 521 F.2d

1113, 1118 (2d Cir.1975); *Weiner v. Winters,* 50 F.R.D. 306, 310 (S.D.N.Y.1970).

Citizens also argues, however, that its members have standing to sue by virtue of the fact that they are residents of the Shoreham area. Citizens projects that if the County prevents Shoreham from operating, then LILCO will build a non-nuclear facility in the vicinity. That other facility would then have an adverse effect on the environment. Citizens analogizes its situation to that of the plaintiffs found to have standing in *Duke Power Co. v. Carolina Environmental Study Group,* 438 U.S. 59, 98 S.Ct. 2620, 57 L.Ed.2d 595 (1977).

The plaintiffs in *Duke Power* were persons living in the vicinity of a nuclear power plant under construction. They alleged in their cause of action that the Price-Anderson Act, which limited liability in the case of a nuclear accident, violated their rights under the fifth amendment. *Id.* at 67–68, 98 S.Ct. at 2627. To establish an injury sufficient to confer standing, plaintiffs alleged that the plant being constructed would: emit small quantities of non-natural radiation; cause thermal pollution of recreational waters and interfere with the normal use of a local river; reduce neighboring property values; create an objectively reasonable fear of harm in the plaintiffs; and continually threaten an accident for which plaintiffs would not be adequately compensated. *Id.* at 73, 98 S.Ct. at 2630.

The Supreme Court found that the plaintiffs in *Duke Power* had standing based upon "the 'immediate' adverse effects" that harmed the plaintiffs. *Id.* Specifically, the court cited "the environmental and aesthetic consequences of the thermal pollution of the two lakes in the vicinity.... And the emission of non-natural radiation." *Id.* at 73–74, 98 S.Ct. at 2630. The court avoided deciding whether "the possibility of a nuclear accident and the present apprehension generated by this future uncertainty, are sufficiently concrete to satisfy constitutional requirements." *Id.* at 73, 98 S.Ct. at 2630.

■ A claim that environmental harm has resulted from a defendant's action is a sufficient injury in fact to confer standing. In this case, Citizens' allegation that defendants' actions might cause the abandonment of Shoreham, which in turn would cause the construction of a non-nuclear, polluting facility in the area, is somewhat attenuated. It is not nearly so attenuated, however, as the allegation held sufficient to confer standing in *United States v. Students Challenging Regulatory Agency Procedures (SCRAP),* 412 U.S. 669, 93 S.Ct. 2405, 37 L.Ed.2d 254 (1973).

In *SCRAP* an unincorporated association formed by five law students from the District of Columbia metropolitan area objected to a railroad rate increase on the theory that such an increase would "cause use of nonrecyclable commodities as compared to recyclable goods, thus resulting in the need to use more natural resources to produce such goods, some of which resources might be taken from the Washington area." *Id.* at 688, 93 S.Ct. at 2416. The court held that *SCRAP* had standing because it could not be said that the pleaded allegations would not be proved at trial. *Id.* at 689–90, 93 S.Ct. at 2416–17.

■ Citizens' allegations of environmental harm, if true, are sufficient injury in fact to support standing. The court may not at this point say that Citizens' allegations would not prove true at trial. Furthermore, promoting nonpolluting sources of energy in order to protect the environment is an interest germane to Citizens' purposes as an organization. Accordingly, Citizens has pleaded a sufficient basis for standing. *See Rockford League of Women Voters v. United States Nuclear Regulatory Commission,* 679 F.2d 1218, 1221–22 (7th Cir.1982) (organization with members living in vicinity of unlicensed nuclear plant has standing to challenge NRC refusal to revoke construction permit).

■ Defendants also contend that the District does not have standing. The injury in fact to the District is, however, more direct and concrete than that to Citizens. "There is no question that an association may have standing in its own right to seek

judicial relief from injury to itself." *Warth v. Seldin,* 422 U.S. 490, 511, 95 S.Ct. 2197, 2211, 45 L.Ed.2d 343 (1974). The District, as a utilizer of tax revenues generated by property values, is directly affected by any actions of the County which effect the usefulness of Shoreham and its environs. Even the appearance that the County may prevent Shoreham from operating could have a direct effect on the District's economic well-being and ability to provide for its residents.

▪▪▪ Lastly, the defendants argue that both Citizens and the District seek to advance interests not within the zone of interests of the AEA. The zone of interests test is a prudential requirement for standing apart from the case or controversy requirements of Article III. First formulated by the Supreme Court in *Data Processing v. Camp,* the zone of interests test requires that "the interest sought to be protected by the complaint is *arguably* within the zone of interests to be protected or regulated by the statute or constitutional guarantee in question." *Data Processing v. Camp,* 397 U.S. 150, 153, 90 S.Ct. 827, 830, 25 L.Ed.2d 184 (1969) (emphasis added).

The zone of interests test is, by its terms, a liberally applied standard. The AEA states as one of its purposes the effectuation of "widespread pai ;cipation in the development and utilization of atomic energy for peaceful purposes to the maximum extent consistent with the public defense and security and with the health and safety of the public." 42 U.S.C. § 2013(d). The environmental and economic interests of the District and Citizens fall, at least arguably, within the zone of interests created by the AEA's broad purposes.

It has been necessary to address the issue of standing because standing is a threshhold issue as to whether the particular parties to an action are properly before the court. Accordingly, it is determined that Citizens and the District do have standing to pursue their alleged causes of action. It should be noted, however, that given the unchallenged standing of LILCO

in this matter the essential interests of Citizens and the District would be addressed regardless of their standing.

### III

The next issue to be addressed is whether plaintiffs' claim that the County's resolutions have violated the supremacy clause by attempting to regulate a preempted area states a valid cause of action. As this matter is currently before the court on a motion to dismiss, the material faċtual allegations of the complaint are accepted as true for the purpose of deciding the instant motion. *Scheuer v. Rhodes,* 416 U.S. 232, 236, 94 S.Ct. 1683, 1686, 40 L.Ed.2d 90 (1974); *Oneida Indian Nation of New York v. State of New York,* 691 F.2d 1070, 1074 (2d Cir.1982). It would appear, at any rate, that there is little disagreement concerning the chain of factual occurrences which has brought the parties to this point. It also appears that there is little disagreement concerning the relevant case law bearing on the issue to be decided. Both sides of the controversy cite *Pacific Gas and Electric Company v. State Energy Resources Conservation and Development Commission,* 461 U.S. 190, 103 S.Ct. 1713, 75 L.Ed.2d 752 (1983), and *Silkwood v. Kerr-McGee Corp.,* 464 U.S. 238, 104 S.Ct. 615, 78 L.Ed.2d 443 (1984), in support of their positions.

▪▪ Reduced to its simplest form, plaintiffs' theory runs as follows. The defendants' conduct regarding radiation emergency response planning amounts to local regulation of the health and safety aspects of nuclear power production. All local regulation of the health and safety aspects of nuclear power production is federally preempted. The defendants' conduct regarding radiation emergency response planning is, therefore, preempted. Accordingly, plaintiffs seek a judgment declaring the County's resolutions to be void and illegal.

Plaintiffs' argument is, of course, logically compelling if their premises are correct. The argument fails, however, because the conduct of the defendants has not in fact

amounted to a regulation of nuclear power production. The defendants have not acted in contradiction of the AEA and plaintiffs' cause of action must fail.

There are three basic means by which Congress may preempt state authority. First, it may do so expressly. Second, Congress may form a "scheme of federal regulation so pervasive as to make reasonable the inference that Congress left no room to supplement it." *Pacific Gas,* 103 S.Ct. at 1722 (citation omitted). Third, Congress may preempt state law to the extent that the state law conflicts with federal law. *Id.* The federal government has in fact occupied the entire field of nuclear power safety. *Id.* at 1726. The County may not, therefore, regulate nuclear power production or create a moratorium on the construction of nuclear power plants because of safety concerns.[1]

It is not disputed that defendants oppose Shoreham's operation. *See* Defendants' Memorandum in Response to Long Island Lighting Company's Memorandum in Opposition to the Motion to Dismiss at 2. There are, however, some channels available in which defendants may express their opposition without impermissibly regulating nuclear safety. Defendants certainly may advocate their views before the NRC despite plaintiffs' contention that such advocacy is part of the defendants' overall plan to thwart nuclear power production. *See* 10 CFR § 2.715(c) (1984). Similarly, defendants do not impermissibly regulate by pursuing alleged grievances with LIL-CO in the state and federal courts.

The only act of defendants which may arguably be said to regulate nuclear safety is the passage of resolutions 262–1982, 456–1982 and 111–1983. These resolutions effectively established the County's policy to oppose nuclear power facilities within its borders and to refuse to cooperate in radiological emergency response planning. Plaintiffs' argument is somewhat unique in that the County's refusal to act in a given area is what is objected to as preempted. Although the passage of the resolutions may be said to be a positive act, in essence the resolutions merely manifest the County's intention not to engage in emergency planning. In order to determine whether defendants' refusal to participate is in fact a preempted regulation of nuclear safety, the court looks to judicial precedent and the legislative history of the AEA for guidance.

A local government may not establish itself as a second nuclear regulatory authority with safety requirements over and above those of the NRC. In *Northern States Power Company v. Minnesota,* for example, the Eighth Circuit held that Minnesota could not exert dual control with the Atomic Energy Commission ("AEC")[2] over the level of radioactive effluent that could be discharged by a nuclear facility. 447 F.2d 1143, 1149 (1971), *aff'd mem.,* 405 U.S. 1035, 92 S.Ct. 1307, 31 L.Ed.2d 576 (1972). Similarly, in *United States v. City of New York,* it was held that New York City could not require nuclear reactor operators to obtain a city license in addition to an AEC license. 463 F.Supp. 604, 613–14 (S.D.N.Y.1978).

*Northern States Power* and *City of New York* provide examples of preempted conduct, but their application to the facts in this case is limited. Certainly the County may not require LILCO to· comply with the County's requirements for a satisfactory RERP; whether LILCO's RERP is sufficient is a question for the NRC, and the County may not override the NRC's judgment. Here, however, the County has not passed a moratorium on nuclear plant

---

1. Defendants contend that this teaching from *Pacific Gas,* which was not necessary to the court's determination in that case, does not survive the court's subsequent decision in *Silkwood. See Wilkwood,* 104 S.Ct. at 627–28 (Blackmun, J., dissenting) (*Pacific Gas* incompatible with *Silkwood* ). Because the defendants did not in fact regulate nuclear safety or create a moratorium on plant construction, it is not now necessary to resolve any tension between the two cases.

2. The Atomic Energy Commission was the predecessor of what is now the NRC.

construction and operation based on the County's opinion that no satisfactory RERP can be devised. Rather the County has adopted the position that a satisfactory RERP is not obtainable. The County has not and cannot supersede the judgment of the NRC on whether or not a license should issue for Shoreham. Once the NRC makes that decision the County's opinion on LILCO's RERP will become academic.

*Pacific Gas* established that Congress had filled the field of nuclear power safety. 103 S.Ct. at 1726. That case, however, dealt with state legislation in the field of the economics of nuclear energy rather than health and safety. Accordingly, it sheds little light on what constitutes safety regulations by a local government.

*Silkwood,* however, does give some guidance on the issue of safety regulations. *Silkwood* addressed the issue of whether a state could award punitive damages against a tortfeasor who was responsible for a radiation injury. Because punitive damages are a means of causing potential tortfeasors to exercise greater care, the damages in *Silkwood* could be seen as an impermissible attempt to regulate nuclear safety standards. *Silkwood,* 104 S.Ct. 615, 621–27.

The *Silkwood* court, however, held that punitive damages in cases involving radiation injuries are not preempted by the AEA. *Id.* The court considered that there was evidence that Congress did not intend to forbid states from providing for punitive damages. *Id.* at 623. The legislative history of the AEA indicated that Congress assumed that the traditional remedies of tort law would continue to "apply with full force unless they were expressly supplanted." *Id.,* 103 S.Ct. at 1721. The court recognized that there was tension between the conclusion that nuclear safety is the concern of federal law and the conclusion that the states may provide for punitive damages. That tension, however, was inherent in Congress' approach to nuclear regulation. *Id.*

An examination of the relevant legislative history in this case leads to a similar conclusion. Congress was well aware of the possibility that local governments might refuse to cooperate in furnishing a RERP. The possibility that a state might frustrate completion of a RERP was expressly addressed from the floor of the Senate. Senator Johnston stated that it was "reasonable to expect" that states might "simply not ... submit an evacuation plan." 125 Cong.Rec.S. 9473 (daily ed.) July 16, 1979. Senator Simpson commented that "[t]he possibility that ... a plant under construction could have its permit terminated because the state where it is sited has failed to form a plan ... is not a matter to which we should give only cursory attention." *Id.*

The Senate debate on this point indicates that the Senate was aware that a local government could refuse to participate in emergency planning. The Senate did not, however, adopt an amendment to require local government participation. Presumably, the Senators were motivated at least partly by a reluctance to create "a fundamental shift in the federal system ... [that] would give some authority to the Federal Government which has never before been obtained by the Federal Government in this area." *Id.* at S. 9476 (statement of Sen. Hart).

The Joint Explanatory Statement of the Committee on Conference states that

[t]he conferees sought to avoid penalizing an applicant for an operating license if a state or locality does not submit an emergency response plan to the NRC for review or if the submitted plan does not satisfy all the guidelines or rules. In the absence of a state or local plan that complies with the guidelines or rules, the compromise permits NRC to issue an operating license if it determines that a State, local or *utility* plan, such as the emergency preparedness plan submitted by the applicant, provides reasonable assurance that the public health and safety is not endangered by operation of the facility.

1980 *U.S.Code Cong. & Ad.News* 2260, 2270–71 (emphasis added). This passage

indicates that Congress considered the possibility that a state or local government or both would fail to participate in emergency planning. Rather than require participation, Congress provided that the utility could provide a plan.

Plaintiffs in this action ask the court to find that the AEA preempts the County from refusing to participate in emergency planning. The facts in this case, however, present a stronger case against preemption than the facts in *Silkwood*. Congress foresaw the possibility of a local government refusing to cooperate, assumed that such refusal was within the local government's discretion, and provided for the utility to present its own plan to the NRC.

Under these circumstances it cannot be said that the defendants have impermissibly entered the preempted area of nuclear power safety regulation. Plaintiffs' claim for declaratory relief based on preemption is, therefore, dismissed.

### IV

■ The state law claims of Citizens and the District are before this court based on pendent jurisdiction. Considering the dismissal of the federal causes of action of these two plaintiffs, the state law claims should now be dismissed as well. *United Mine Workers of America v. Gibbs*, 383 U.S. 715, 726, 86 S.Ct. 1130, 1139, 16 L.Ed.2d 218 (1966); *Nolan v. Meyer*, 520 F.2d 1276, 1280 (2d Cir.) *cert. denied*, 423 U.S. 1034, 96 S.Ct. 567, 46 L.Ed.2d 408 (1975).

### V

■ Lastly, LILCO has alleged a violation of 42 U.S.C. § 1983. In order to state a valid cause of action under § 1983 LILCO must satisfy two criteria. First, the conduct complained of must have been committed under color of state law. *Parratt v. Taylor*, 451 U.S. 527, 535, 101 S.Ct. 1908, 1912, 68 L.Ed.2d 420 (1980). This criterion is not contested in the present action. Second, the complained of conduct must have deprived LILCO of rights, privileges, or immunities secured by the Constitution or laws of the United States. *Id.*

■ LILCO claims that the defendants violated LILCO's statutory right under the AEA to seek a license to operate a nuclear power facility. 42 U.S.C. §§ 2133(b), 2137, 2235. It is unquestionably true that federal statutory rights may form the basis of a valid claim under § 1983. *Maine v. Thiboutot*, 448 U.S. 1, 100 S.Ct. 2502, 65 L.Ed.2d 555 (1980). In this instance, however, there are flaws in plaintiff's claim for relief.

■ First, the right which LILCO seeks to protect, the right to seek a license for Shoreham, has not been taken from it. LILCO is currently seeking a license from the NRC and the NRC alone has the power to decide whether the license will be granted. Defendants' actions in seeking to influence the NRC's decision are not in and of themselves an unlawful interference with the licensing process. *See III, supra.*

■ Second, although valid § 1983 claims may arise from federal statutes, not all federal statutes are a valid source of § 1983 claims. *Middlesex County Sewerage Authority v. National Sea Clammers Association*, 453 U.S. 1, 19, 101 S.Ct. 2615, 2625, 69 L.Ed.2d 435 (1981). In order to determine whether a particular statute gives rise to a § 1983 claim the courts must consider "(i) whether Congress had foreclosed private enforcement of the statute in the enactment itself, and (ii) whether the statute at issue [is] the kind that [creates] enforceable 'rights' under § 1983." *Id.*

*Maine v. Thiboutot* provides an example of the type of statute found to give rise to rights under § 1983. In *Thiboutot*, the Maine Department of Health and Human Services interpreted 42 U.S.C. § 602(a)(7) to require payment of Aid to Families with Dependent Children to Lionel Thiboutot based on his three children from his first marriage. Thiboutot did not receive any aid for his five children from his second marriage even though he was legally obligated to support them. *Maine v. Thiboutot*, 448 U.S. at 3, 100 S.Ct. at 2503. The

court found that Thiboutot did in fact have a § 1983 claim under the Social Security Act. *Id.* at 4–8, 100 S.Ct. at 2504–06.

*Middlesex County,* on the other hand, provides an example of a statute that does not give rise to rights under § 1983. 453 U.S. 1, 101 S.Ct. 2615, 69 L.Ed.2d 435 (1981). In *Middlesex County,* the court found that the Federal Water Pollution Control Act and the Marine Protection, Research, and Sanctuaries Act were comprehensive pieces of legislation and that Congress did not intend them to create a right of action under § 1983. As a result, the shellfish harvesters who brought the action were not afforded rights under § 1983. *Id.* at 20–21, 101 S.Ct. at 2626–27. Similarly, the Ninth Circuit held in *First National Bank of Omaha v. Marquette National Bank* that allowing a cause of action under § 1983 "for interference with rights pursuant to the National Bank Act, would represent a dramatic and unwarranted extension of the Civil Rights Act. We do not believe that such a departure is mandated by the opinion in *Thiboutot* or that such a cause of action was within the intent of the Congress that enacted the civil rights statutes." 636 F.2d 195, 199 (1980).

The situation presented by the facts of this case is more similar to that in *Middlesex* and *First National Bank* than in *Thiboutot.* The AEA is a complex, comprehensive piece of legislation which does not provide for private causes of action. LILCO's § 1983 claim, therefore, may not be based on an alleged violation of the AEA.

 LILCO also alleges that it is entitled to relief under § 1983 because defendants have violated its right to property in the Shoreham facility. The problem with this theory is that a taking of Shoreham has not occurred; the question of whether or not Shoreham will be granted an operating license is currently before the NRC. *See Long Island Lighting Co. v. County of Suffolk,* 604 F.Supp. 759 (E.D.N.Y. 1984). At this point in time LILCO has lost only the support of the County before the NRC, which, until 1982, LILCO had expected to receive. Such an expectation of sup-

port before a federal regulatory agency does not constitute a property right.

 LILCO argues that its investment-backed reasonable expectation of County support is sufficient to establish a property interest under *Ruckelshaus v. Monsanto Co.* —— U.S. ——, 104 S.Ct. 2862, 81 L.Ed.2d 815 (1984). *Monsanto,* however, merely held that an intangible bundle of rights, such as exists in a trade secret, may constitute property under the fifth amendment. *Id.,* 104 S.Ct. at 2871–79. Plaintiff in effect asks this court to go several steps further than *Monsanto* in order to hold that an intangible expectancy of a future occurrence constitutes property under the Constitution.

LILCO's argument on this point is similar to that of the plaintiff in *Beacon Syracuse Associates v. City of Syracuse,* 560 F.Supp. 188 (N.D.N.Y.1983). In *Beacon,* the plaintiff brought a § 1983 claim because the city had instituted a new urban renewal plan. *Id.* at 191–92. Plaintiff alleged that the new plan violated his constitutional property rights by frustrating his "investment-backed expectations." *Id.* at 197. The *Beacon* court found that plaintiff had "no property interest entitled to due process protection." *Id.* at 198. This court reaches the same conclusion as to LILCO in this case.

 LILCO next alleges that it has been denied a protected liberty interest without due process of law. Producing nuclear power, LILCO argues, is a legal activity encouraged by federal policy. LILCO may not be denied the right to engage in such a legal activity without due process. *See Schware v. Board of Bar Examiners,* 353 U.S. 232, 77 S.Ct. 752, 1 L.Ed.2d 796 (1957) (right to practice law); *Freitag v. Carter,* 489 F.2d 1377 (7th Cir.1973) (right to obtain taxicab license).

One immediately apparent distinction between most of the cases relied on by LILCO and the facts in this case is that defendants have not denied LILCO a license. If LILCO is denied a license, it will be by the

NRC. Under these circumstances, it would seem that whatever process is due in the licensing process is due from the NRC and not from the defendants.

At least one case, however, does stand for the proposition that it may be a denial of liberty for a government entity to merely influence a licensing process. In *Flores v. Pierce*, the City of Calistoga, California, filed official protests with the State Department of Alcohol Beverage Control in order to prevent the issuance of a liquor license to certain individuals. 617 F.2d 1386, 1388 (9th Cir.), *cert. denied*, 449 U.S. 875, 101 S.Ct. 218, 66 L.Ed.2d 96 (1980). The City acted as it did in order to discriminate against the applicants as Mexican-Americans. *Id.* The evidence in the case established that the City's protests were intended to delay, and did in fact delay, the issuance of a license based on the plaintiff's race and national origin. *Id.* at 1391.

The problem with applying *Flores* to the instant situation is that *Flores* involved a plaintiff who was a member of a suspect classification. Nevertheless, the court accepts *Flores* as precedent for the general proposition that mere interference in a licensing process may under some circumstances violate a constitutionally protected liberty interest.

██ LILCO's argument that its liberty interest has been violated is closely related to its final argument that it has been denied equal protection under the law. LILCO contends that other entities within the County are not denied County services, such as those of the police and fire departments. Because it is being treated differently from other entities similarly situated, LILCO argues that defendants have violated the Constitution's equal protection requirement. *See Memorial Hospital v. Maricopa*, 415 U.S. 250, 94 S.Ct. 1076, 39 L.Ed.2d 306 (1974) (denial of medical services to indigent people who exercise right to travel); *Thompson v. New York*, 487 F.Supp. 212, 213, 216–17 (N.D.N.Y.1979) (denial of police and fire services to American Indians).

Unlike the plaintiffs in *Memorial Hospital, Thompson* and *Flores*, LILCO is not a member of a protected class. LILCO's claim that defendants' actions violated its liberty and equal protection rights can only succeed if the County has no rational basis for opposing Shoreham's licensing. *See, e.g., Schware*, 353 U.S. at 238–39, 77 S.Ct. at 755–56.

The rational basis standard is not a difficult standard for the County to satisfy. All that needs to appear is that the County acted in furtherance of a legitimate objective and its acts were rationally connected to that end. *Id.* In applying the rational basis test this court may not apply its own judgment as to whether or not the County acted in the best interests of its residents. This court is not a super-legislature which approves or disapproves of local government policy. If any state of facts justifies the County's actions, then the County has withstood the rationality standard.

LILCO argues that because the County may not regulate nuclear safety and health that it may not claim the health and safety of its residents as a legitimate objective. While it is true that the County may not regulate nuclear safety, it does not follow that the County may not try to influence those who do regulate nuclear safety. The County's actions may, therefore, be directed toward the objective of protecting its residents.

LILCO further argues that if the County were truly interested in the health and safety of its residents, then it would try to develop an emergency evacuation plan. The County, however, through its elected legislators, has taken the position that a satisfactory evacuation plan cannot be fashioned and that it can best provide for the health and safety of its residents by refusing to cooperate with LILCO in an attempt to convince the NRC otherwise. This court may not second guess the wisdom of that decision.

As the County has not acted without a rational connection to a legitimate interest, LILCO's equal protection and liberty argu-

ments must fail. LILCO's § 1983 claim is dismissed.

## CONCLUSION

For the reasons stated above, defendants' motion to dismiss pursuant to F.R. Civ.P. 12(b)(1) and 12(b)(6) is granted. The clerk is directed to enter judgment accordingly.

SO ORDERED.